## UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| Information associated with One Target ) | Case No.   MJ21-307 |
| Accounts/Identifiers, for Investigation of 21 ) | |
| U.S.C. § 841(a)(1), 843, and Other Offenses ) | |

### APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in the Western District of Washington, there is now concealed property and evidence described in Attachment B.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § § 841(a)(1) and 843 | Drug trafficking |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of ___ days (give exact ending date if more than 30 days: 10/08/2021) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

*Applicant's signature*

Scott Fusco, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by Telephone.

Date: May 26, 2021

*Judge's signature*

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

City and State:  Seattle, Washington

# ATTACHMENT A

### Property to Be Searched and Subscriber/Subject Information

1.      Records and information associated with the cellular phone assigned call number 562-639-5618, with listed subscriber "Samuel Gutierrez" (the "**Target Telephone 1**" or "**TT1**"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 12920 SE 38th Street Bellevue, WA. The subscriber/customer of **TT1** is "Samuel Gutierrez." The identity of the person who is the subject of the criminal investigation is Raymundo ESPIDIO Gomez.

2.      **Target Telephone 1.**

Attachment A - 1
USAO #2021R00661

# ATTACHMENT B
## Particular Things to Be Seized

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding **TT1**. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.      <u>Section I</u>:  **Information to be Disclosed by as T-Mobile**

1.      **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

        a.      Names (including subscriber names, user names, and screen names);

        b.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        c.      Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

        d.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

        e.      Length of service (including start date) and types of service utilized;

        f.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

1          g.      Other subscriber numbers or identities (including the registration

2    Internet Protocol ("IP") address); and

3          h.      Means and source of payment for such service (including any credit

4    card or bank account number) and billing records.

5        2.     **Pen Register/ Trap and Trace Data and Associated Subscriber Records**

6    **to Be Provided for a Period of no more than 45 Days from Activation.**

7          a.      T-Mobile shall install and monitor pen-trap devices to record,

8    decode, and/or capture dialing, routing, addressing, and signaling information associated

9    with each communication to or from **TT1** including the date, time, and duration of the

10   communication, and the following, without geographic limit and without notice to the

11   subscriber:

12   (i)     IP addresses associated with the cell phone device or devices used to send or

13           receive electronic communications;

14   (ii)    Any unique identifiers associated with the cell phone device or devices used

15           to make and receive calls with the cell phone number described in

16           Attachment A, or to send or receive other electronic communications,

17           including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

18   (iii)   IP addresses of any websites or other servers to which the cell phone device

19           or devices connected; and

20   (iv)   Source and destination telephone numbers and email addresses.

21         b.    On a 24-hour-a-day basis, for the duration of the authorized pen-trap

22   devices, T-Mobile shall provide the following records for those subscribers whose

23   identifiers are obtained pursuant to the use of the pen-trap devices:  published or non-

24   published subscriber names and addresses, including billing addresses.

25

26

27

28

Attachment B - Phone - 2
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.     **Historical Cell Cite Location Information.**

a.     All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from May 7, 2021 until May 25, 2021, including:

i.     the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.     historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.  This information is to be provided irrespective of the application, name, or report utilized by the T-Mobile.  Accordingly, this information includes the following data sets to the extent that they are collected by the T-Mobile: RTT, PLU, PCMD, NELOS, EVDO, TruCall, ALULTE, and Timing Advance.

b.     The physical address and coverage maps of cell towers used by the Target Cell Phone.

4.     **Prospective Cell Site Location Information.**

a.     All information about the location of **TT1** described in Attachment A for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.     The physical address and coverage maps of cell towers used by **TT1**.

5.     **Prospective E-911/GPS and Cell Site Triangulation Information.**

Attachment B - Phone - 3
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        a.     All information about the location of **TT1** described in Attachment

2  A for **a period of 45 days**, during all times of day and night.  This information includes:

3  all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise

4  location information, as well as all data about which "cell towers" (i.e., antenna towers

5  covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a

6  radio signal from the cellular telephone(s) or account(s) described in Attachment A.

7        b.     The physical address and coverage maps of cell towers used by the

8  Target Cell Phone.

9

10       To the extent that the location information described in the previous paragraphs

11  (hereinafter, "Location Information") is within the possession, custody, or control of T-

12  Mobile, T-Mobile is required to disclose the Location Information to the government

13  pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-

14  (b), T-Mobile must furnish the government all information, facilities, and technical

15  assistance necessary to accomplish the collection of the Location Information

16  unobtrusively and with a minimum of interference with T-Mobile's services.  The

17  government shall compensate T-Mobile for reasonable expenses incurred in furnishing

18  such facilities or assistance.

19

20  **II.**    **Section II:  Information to Be Seized by the Government**

21       1.     All information described above in Section I that will assist in investigating

22  Raymundo ESPIDIO Gomez or unidentified subjects who are engaged in violating 21

23  U.S.C. §§ 841(a)(1) and 21 U.S.C. § 843.

24       2.     All non-content subscriber/account information provided pursuant to 18

25  U.S.C. § 2703(c).

26       3.     All non-content dialing, routing, addressing, and signaling information

27  provided pursuant to 18 U.S.C. §§ 3121-3127.

28       4.     Location Information regarding **TT1**.

Attachment B - Phone - 4
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Law enforcement personnel (who may include, in addition to law enforcement
2  officers and agents, attorneys for the government, attorney support staff, agency
3  personnel assisting the government in this investigation, and outside technical experts
4  under government control) are authorized to review the records produced by T-Mobile in
5  order to locate the things particularly described in this Warrant.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attachment B - Phone - 5
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**AFFIDAVIT OF SCOTT FUSCO IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER**

STATE OF WASHINGTON )

) ss

COUNTY OF KING )

I, Scott Fusco, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 562-639-5618, with listed subscriber "Samuel Gutierrez" (the **"Target Telephone 1"** or **"TT1"**), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 12920 SE 38th Street, Bellevue, WA. **TT1** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. As set forth below, there is probable cause to believe that **TT1** is being used by Raymundo Espidio Gomez ("ESPIDIO") in furtherance of drug trafficking in violation of Title 21 of the United States Code, and that obtaining location and other information for this instrumentality will further the investigation.

## ECPA

2.      The Court has jurisdiction to issue the proposed warrant for **TT1** under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## Pen Register Act

3.      Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or

AFFIDAVIT OF SA FUSCO - 1
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed

2  to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

3      4.    The Court has jurisdiction to issue the requested pen-trap order because it is

4  a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court

5  is a district court of the United States that "has jurisdiction over the offense being

6  investigated." 18 U.S.C. § 3127(2)(A)(i).

7      5.    This application includes all the information required by the Pen Register

8  Act.  *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a

9  certification from Assistant United States Attorney Karyn S. Johnson that (1) identifies

10  Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA),

11  and the Seattle Police Department (SPD) as the law enforcement agencies conducting the

12  investigation and (2) certifies the information likely to be obtained is relevant to an

13  ongoing criminal investigation being conducted by those agencies.  18 U.S.C. § 3122(b).

14  The Assistant United States Attorney is an "attorney for the government" as defined in

15  Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

16      6.    A "pen register" is "a device or process which records or decodes dialing,

17  routing, addressing, or signaling information transmitted by an instrument or facility from

18  which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3).  A "trap

19  and trace device" is "a device or process which captures the incoming electronic or other

20  impulses which identify the originating number or other dialing, routing, addressing, and

21  signaling information reasonably likely to identify the source of a wire or electronic

22  communication." 18 U.S.C. § 3127(4).

23      7.    In the traditional telephone context, pen registers captured the destination

24  phone numbers of outgoing calls, while trap and trace devices captured the phone

25  numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic

26  communications such as emails, text messages, connection logs, and data transfers.  The

27  prospective location data sought in this application constitutes "dialing, routing,

28  addressing, and signaling information" covered by the Pen Register Act.  Accordingly,

AFFIDAVIT OF SA FUSCO - 2
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    the requested warrant will record, decode, and/or capture dialing, routing, addressing, and
2    signaling information associated with **TT1** without geographic limit.

3    8.    The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and
4    3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-
5    Mobile and any other person or entity providing wire or electronic communication
6    service in the United States whose assistance may facilitate execution of this warrant
7    furnish, upon service of the warrant, information, facilities, and technical assistance
8    necessary to install the pen/trap, including installation and operation of the pen-trap
9    unobtrusively and with minimum disruption of normal service.  Any entity providing
10   such assistance shall be reasonably compensated by HSI, pursuant to 18 U.S.C.
11   § 3124(c), for reasonable expenses incurred in providing facilities and assistance in
12   furtherance of the warrant.

13   9.    Through this application, the United States does not request and does not
14   seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).

15   10.    Based on the facts set forth in this affidavit, I submit that there is probable
16   cause that Raymundo ESPIDIO Gomez ("ESPIDIO") is currently engaged in drug
17   trafficking, in violation of 21 U.S.C. §§ 841(a)(1), as described below, and that ESPIDIO
18   is currently utilizing **TT1** during the commission of, and in furtherance of, these offenses.

19   11.    This is the first application for pen register, trap and trace, and ping order
20   for **TT1** in this judicial district in connection with this investigation.

## AGENT BACKGROUND

22   12.    I am a Special Agent with Homeland Security Investigations ("HSI")
23   within the United States Department of Homeland Security (DHS).  As a Special Agent, I
24   investigate violations of the Controlled Substance Act, Title 21, United States Code,
25   Section 801, et seq., and other violations of federal law.  I have been a Special Agent
26   with HSI since September 2019.  I was trained to conduct investigations relating to
27   violations of federal law including the manufacturing and trafficking of controlled
28   substances and money laundering through the Criminal Investigator Training Program

AFFIDAVIT OF SA FUSCO - 3
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and the Homeland Security Investigations Special Agent Training Program at the Federal

2  Law Enforcement Training Center in Glynco, Georgia. Prior to my employment with

3  HSI, I worked as a US Customs and Border Protection Officer (CBPO) from 2011

4  through 2019 domestically and abroad. Throughout my time as a CBPO, I worked in

5  counterterrorism, and was a member of a narcotics enforcement team and an

6  admissibility enforcement unit.

7       13.     As a federal law enforcement officer, I have received formal training, as

8  well as extensive on-the-job training, in the investigation of narcotics trafficking. I have

9  conducted and participated in investigations involving controlled substances, money

10 laundering, and other criminal activity, including those leading to arrest and prosecution.

11 As a result of these investigations, I have become familiar with methods and techniques

12 used by narcotics manufacturers and distributors, persons in possession of narcotics for

13 purposes of sales and transportation, and persons conspiring to transport and sell

14 narcotics. I am also familiar with the methods employed by narcotics traffickers to

15 conceal their trafficking activity and the origin of proceeds generated by this activity. I

16 am aware that traffickers use slang and coded words, multiple cell phones, concealed

17 compartments, "stash" houses to conceal their activities, and launder or otherwise

18 conceal cash proceeds by hiding and transporting bulk cash, sending funds through wire

19 transfers or bank accounts in other persons' names, or investing in assets placed in other

20 persons' names. I have also worked and consulted with numerous law enforcement

21 officers experienced in narcotics and money laundering investigations. As a result, I am

22 familiar with how money launderers and drug traffickers speak to each other and

23 generally conduct business. For example, I am aware that money launderers and drug

24 traffickers discussing criminal matters over the phone often speak in code or in vague

25 terms. I am also aware that these subjects frequently (1) provide false subscriber

26 information to the service providers, (2) use phones which are subscribed to under

27 identities other than their own, and (3) change phones in order to avoid detection by law

28 enforcement.

AFFIDAVIT OF SA FUSCO - 4
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     14.    The facts in this affidavit come from my personal observations, my training

2  and experience, and information obtained from other law enforcement officers/agents and

3  witnesses.  This affidavit is intended to show merely that there is sufficient probable

4  cause for the requested warrant, and therefore does not set forth all of my knowledge

5  about this matter.

6     15.    Based on the facts set forth in this affidavit, there is probable cause to

7  believe that violations of Title 21, United States Code, Section 841(a)(1) (distribution of

8  controlled substances) and Title 21, United States Code, Section 843 (use of a

9  communications facility in furtherance of a felony drug offense) have been committed,

10  are being committed, and will be committed by ESPIDIO and that ESPIDIO is using **TT1**

11  to facilitate his drug trafficking activities.  There is also probable cause to believe that the

12  location information described in this affidavit and in Attachment B1 will constitute

13  evidence of these criminal violations and will lead to the identification of other

14  individuals who are engaged in the commission of these offenses.

15                      **PROBABLE CAUSE**

16    **A. <u>Background</u>**

17     16.    Since January of 2021, the United States, including HSI and the DEA, in

18  conjunction with the Seattle Police Department (SPD), has been conducting a criminal

19  investigation of a drug trafficking organization ("DTO") operating in the Seattle area

20  with connections to Sinaloa, Mexico regarding possible violations of 21 U.S.C.

21  §§ 841(a)(1) and 843. Investigators believe this DTO and its members, including

22  ESPIDIO, are responsible for distributing cocaine, methamphetamine, heroin, and

23  fentanyl-laced imitation Oxycodone pills in the Western District of Washington.

24  ESPIDIO is a target of this investigation.

25     17.    I have participated in the investigation described herein since

26  approximately March of 2021.  I have obtained the facts set forth in this affidavit through

27  personal participation in the investigation described herein, from the review of records,

28  documents, and other evidence obtained during this investigation, from surveillance

AFFIDAVIT OF SA FUSCO - 5
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   operations, and from the debriefing of a Confidential Source ("CS-1"), who is associated
2   with and knowledgeable about the subjects of this investigation.

3       18.     CS-1 is a reliable confidential source currently working with HSI to receive
4   consideration for pending criminal charges.  According to CS-1, CS-1 has known
5   ESPIDIO for over a year and has purchased narcotics from ESPIDIO on several
6   occasions in the past (not under the direction of law enforcement).  CS-1 knows that any
7   false information given to investigators will void any agreement CS-1 has with HSI. CS-1
8   was not made any promises in exchange for his/her cooperation. CS-1's criminal history
9   includes the following arrests and convictions: arrested in Washington state in 2017 for
10  Firearms/Dangerous Weapon violation and was charged with Pistol: Loaded in Vehicle (a
11  misdemeanor), arrested in Washington state in 2018 for Possession of a Stolen Firearm
12  and Possession of a Controlled Substance and was convicted of Possession of a
13  Controlled Substance (a felony). In January of 2021, CS-1 was arrested by HSI agents
14  during an undercover buy-bust operation. At the time of CS-1's arrest, CS-1 was the
15  hired driver of a subject who was selling counterfeit fentanyl-laced Oxycodone pills. CS-
16  1 was discovered to have a loaded handgun under/near CS-1's leg at the time of his/her
17  arrest and was also in possession of cocaine, rifle magazines and ammunition, a
18  switchblade knife, marijuana paraphernalia, approximately $2000 cash, and several
19  suspected counterfeit pills. CS-1 has not been charged for this incident. CS-1 further
20  states that he/she used to use controlled substances and has received drug rehabilitation
21  treatment. CS-1 has been actively participating in this investigation since approximately
22  January of 2021.  Information provided by CS-1 has been corroborated through a review
23  of financial documents, surveillance, official reports prepared by law enforcement
24  officers familiar with this investigation, and in other investigations.

25      19.     Sometime in January of 2021, CS-1 advised personnel with HSI about a
26  cocaine and pill dealer operating in the south Seattle area that CS-1 knew only by his
27  nickname. CS-1 described this individual as having a "man bun." CS-1 provided agents
28  with a Washington State license plate of a vehicle this individual was driving. Law

AFFIDAVIT OF SA FUSCO - 6
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   enforcement system checks reveal the address associated with the license plate is also

2   associated to Raymundo ESPIDIO Gomez. The Washington Driver's License photo of

3   Raymundo ESPIDIO Gomez shows ESPIDIO having a "man bun".  When shown the

4   Washington Driver's License photo of Raymundo ESPIDIO Gomez, CS-1 confirmed hat

5   this was the cocaine and pill dealer that he/she knew only by his nickname.  As further

6   discussed below, investigators have utilized CS-1 to conduct a controlled purchase of 500

7   suspected fentanyl-laced counterfeit Oxycodone pills from ESPIDIO.

8      20.    I know that a common counterfeit Oxycodone pill is commonly referred to

9   as "M30," which refers to the pill imprint of "30 M" on the pill. Genuine Oxycodone

10  Hydrochloride is typically in the form of a blue, round pill, is commonly prescribed in the

11  treatment of chronic pain and typically has a diverted street value of $1 per milligram of

12  oxycodone, i.e., $30 for a 30-milligram pill. Fentanyl is a powerful synthetic opioid that

13  is like morphine but is 50 to 100 times more potent. It is a prescription drug that is also

14  made and used illegally, including in the production of counterfeit Oxycodone pills.

15     21.    The high potency of fentanyl greatly increases risk of overdose, especially

16  if a person who uses drugs is unaware that a pill contains it and/or that the potency of the

17  pill is unknown by the intended user. The user can then underestimate the dose of opioids

18  they are taking, resulting in overdose that can result in seriously bodily injury and/or

19  death. I know that fentanyl is commonly used as the active ingredient in the counterfeit

20  production of 30 milligram Oxycodone pill and then sold on the street for multiple

21  reasons, including the potency of the drug and the high profit margins made when

22  counterfeiting Oxycodone pills.

23     22.    The potency of the counterfeit pills containing fentanyl can vary

24  significantly unbeknownst to the individual using the counterfeit pill and is the common

25  cause of overdose death victims. This commonly occurs because the illicit manufacturers

26  of counterfeit Oxycodone pills receive raw materials and press the pills themselves,

27  including using bulk powdered fentanyl. These pill manufacturing operations are not

28  particularly sophisticated, and there are no standards or regulatory bodies that oversee the

AFFIDAVIT OF SA FUSCO - 7
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  production of counterfeit pills to ensure that each pill has a set amount of fentanyl in the

2  pill. This often leads to some pills being lethal doses and others not, even when "pressed"

3  by the same individual.

4      23.    As will be discussed below, investigators directed CS-1 to arrange the

5  controlled buy with ESPIDIO via text messages over **TT1**.  All of the texts between CS-1

6  and ESPIDIO (using **TT1**) discussed herein were reviewed by investigators, and law

7  enforcement has preserved these communications as evidence.  The text message

8  conversations were in Spanish but translated and relayed to me by a fluent Spanish

9  speaker.

10  **B. Discussion of Drug Transaction between ESPIDIO and CS-1 in May of 2021**

11     24.    In April 2021, CS-1 ran into ESPIDIO in person.  This contact was not

12  directed by law enforcement, but CS-1 did report his/her contact with ESPIDIO to law

13  enforcement shortly thereafter.  According to CS-1, during CS-1's encounter with

14  ESPIDIO, ESPIDIO provided CS-1 with his new phone number, **TT1**.  ESPIDIO told

15  CS-1 to contact **TT1** if he/she needed anything, which CS-1 understood to mean that

16  CS-1 could contact ESPIDIO to obtain M-30 pills.

17     25.    At the direction of law enforcement, in May 2021, CS-1 texted ESPIDIO

18  (via **TT1**), writing, in part, "What's up we need 5." According to CS-1, "we need 5"

19  means that CS-1 wanted to purchase 500 M-30 pills.  ESPIDIO replied, in part, "Yup."

20  CS-1 then texted ESPIDIO, in part, "Are you in the same place like last time."

21  According to CS-1, CS-1 was referring to a prior location where CS-1 had purchased

22  M-30 pills from ESPIDIO (not directed by law enforcement).  ESPIDIO did not respond.

23  CS-1 subsequently texted ESPIDIO, in part, "I'm ready." ESPIDIO did not respond.

24     26.    According to CS-1, ESPIDIO, using **TT1**, called CS-1 later that evening.

25  This call was not recorded, however, toll records confirm that ESPIDIO, using **TT1**,

26  contacted CS-1.  According to CS-1, CS-1 told ESPIDIO that he/she was no longer

27  seeking M-30 pills, and ESPIDIO told CS-1 to reach out if CS-1 needed anything.  Based

28  on my training and experience, my/other agent's conversations with CS-1, I believe this

AFFIDAVIT OF SA FUSCO - 8
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   meant that ESPIDIO was willing to conduct narcotics transactions in the future if CS-1

2   contacted him.

3   **C. Controlled Purchase of "M-30" Pills Suspected to Contain Fentanyl**

4        27.    At the direction of law enforcement, later in May 2021, CS-1 contacted

5   ESPIDIO on **TT1** via text message and stated, in part, "What up ….can you do 5."

6   According to CS-1, "5" referred to 500 M-30 pills. ESPIDIO responded, in part,

7   "Ready." CS-1 then stated, in part, "Cool…" In their texts, ESPIDIO (using **TT1**) and

8   CS-1 also agreed upon a date, time, and location to conduct this drug transaction.

9        28.    Prior to the purchase, HSI agents met with CS-1 at a discreet public

10  location. Agents inspected CS-1's person and vehicle for any contraband and currency,

11  with negative results. Agents provided CS-1 with HSI Official Funds and instructed

12  CS-1 to purchase the agreed-upon quantity of 500 M-30 pills from ESPIDIO.

13       29.    After agents met with CS-1, they followed CS-1 from the public location to

14  the prearranged meet location within King County, Washington. CS-1 texted ESPIDIO

15  via **TT1** and indicated that he/she was at the location. ESPIDIO acknowledged this

16  message and directed CS-1 to his exact whereabouts at the location.

17       30.    CS-1 then went to meet ESPIDIO at this specific location. CS-1 was under

18  audio surveillance the entire meeting. The meeting lasted approximately one minute. The

19  meeting between CS-1 and ESPIDIO took place inside a building, out of investigators'

20  sight. CS-1 then left the prearranged meeting location under constant observation by law

21  enforcement.

22       31.    HSI Agents followed CS-1 to a separate location. CS-1 immediately turned

23  over a plastic bag containing approximately 500 light blue circular pills bearing the

24  impression "M" on one side, and "30" on the other. CS-1 confirmed that he/she had

25  received the M-30 pills from ESPIDIO. CS-1 also stated that there were other individuals

26  in the room during CS-1's purchase of the pills from ESPIDIO. One of the agents

27  conducted a search of CS-1's person and vehicle for contraband and currency with

28  negative results. HSI agents transported the evidence to HSI Seattle's Property Evidence

AFFIDAVIT OF SA FUSCO - 9
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Section where the suspected fentanyl was processed in accordance to HSI protocols. A field test of the evidence was not conducted due to safety concerns over exposure to fentanyl. The suspected fentanyl, within its packaging, weighed 61.6 grams. Based upon my training and experience, the pills were consistent in appearance with fentanyl-laced imitation Oxycodone pills. The suspected fentanyl pills were entered into HSI Seattle's Property Evidence. Special Agent Sawyer and I took possession of the suspected fentanyl and submitted the evidence for further testing at the DEA Western Laboratory.

### Knowledge Regarding Cellular Phones

32. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

33. Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course. The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call. They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to

AFFIDAVIT OF SA FUSCO - 10
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    make or receive calls, or to send or receive text messages (which may include
2    photographs, videos, and other data). These telephone numbers can be recorded by pen-
3    trap devices and then used to identify the parties to a communication without revealing
4    the communication's contents.

5        34.    Based my training and experience, I know that a cell phone can also be
6    used to exchange text messages with email accounts. The email addresses associated
7    with those text messages can be recorded by pen-trap devices and then used to identify
8    parties to a communication without revealing the communication's contents.

9        35.    Based on my training and experience, I know that cellular phones can
10    connect to the internet via a cellular network. When connecting through a cellular
11    network, internet communications sent and received by the cellular phone each contain
12    the same unique identifier that identifies cellular voice communications, such as an ESN,
13    MEIN, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications from a cellular
14    phone also contain the IP address associated with that cellular phone at the time of the
15    communication. Each of these unique identifiers can be used to identify parties to a
16    communication without revealing the communication's contents.

17        36.    In my training and experience, I have learned that T-Mobile is a company
18    that provides cellular telephone access to the general public. I also know that certain
19    providers of cellular telephone service have technical capabilities that allow them to
20    collect and generate information about the locations of the cellular telephones to which
21    they provide service, including E-911 Phase II data (also known as GPS data or latitude-
22    longitude data) and cell-site data (also known as "tower/face information" or cell
23    tower/sector records). E-911 Phase II data provides relatively precise location
24    information about the cellular telephone itself, either via GPS tracking technology built
25    into the phone or by triangulating on the device's signal using data from several of the
26    provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers
27    covering specific geographic areas) that received a radio signal from the cellular
28    telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the

AFFIDAVIT OF SA FUSCO - 11
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    telephone connected.  These towers are often a half-mile or more apart, even in urban
2    areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to
3    a wireless device does not necessarily serve every call made to or from that device.
4    Accordingly, cell-site data is typically less precise that E-911 Phase II data.

5        37.    Based on my training and experience, I know that T-Mobile can collect E-
6    911 Phase II data about the location of **TT1**, including by initiating a signal to determine
7    the location of **TT1** on T-Mobile's network or with such other reference points as may be
8    reasonably available.

9        38.    When using a cellular connection to receive or transmit data, a cellular
10   phone typically utilizes a cell tower to make telephone calls, send or receive text
11   messages, send or receive emails, surf the internet, carry out application initiated data
12   transfers, among other things.

13       39.    Based on my training and experience, I know that T-Mobile can collect
14   cell-site data about **TT1**.  Based on my training and experience, I know that for each
15   communication (including data connections) a cellular device makes, its wireless service
16   provider can typically determine: (1) the date and time of the communication; (2) the
17   telephone numbers involved, if any; (3) the cell tower to which the customer connected at
18   the beginning of the communication; (4) the cell tower to which the customer connected
19   at the end of the communication; and (5) the duration of the communication.  I also know
20   that wireless providers such as T-Mobile typically collect and retain cell-site data
21   pertaining to cellular devices to which they provide service in their normal course of
22   business in order to use this information for various business-related purposes.

23       40.    Different service providers use different systems, applications, and reports
24   to collect or analyze cell site data.  These systems, applications, and reports are referred
25   to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon),
26   Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD"
27   (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE,
28   Timing Advance, and TruCall.  RTT data, for example, estimates the approximate

AFFIDAVIT OF SA FUSCO - 12
USAO #2021R00661

distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

41.    Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **TT1's** user or users and may assist in the identification of co-conspirators, source(s) of supply, and other customers and redistributors.

### Knowledge Regarding Drug Trafficking

42.    Based on my training and experience, including experience obtained through my participation in this and other investigations involving the distribution of controlled substances, including those targeting long-term conspiracies responsible for the distribution of controlled substances, and based upon my consultation with other experienced law enforcement agents and officers, I know that:

a.     Those involved in the distribution of illicit drugs often travel by car, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or, cash drug proceeds.

b.     Illicit drugs are frequently transported into the United States and between cities within the United States in bulk, high-purity form, and drug traffickers attempt to

AFFIDAVIT OF SA FUSCO - 13
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  mask the distinct odors of particular drugs during such transport through the use of heat

2  sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer

3  sheets, air fresheners, or axle grease.  Likewise, money is similarly transported in bulk.  It

4  is common for drug traffickers to maintain hidden compartments within passenger

5  vehicles, items altered for the purpose of hiding or concealing drugs, and items purchased

6  and converted for the use of storing their drugs.

7        c.  Those involved in the distribution of illicit drugs often use money

8  remittance businesses to assist in moving and distributing the money earned from their

9  drug trafficking activities.  By using these businesses to wire funds to other parts of the

10  United States and beyond, the drug traffickers are attempting to hide this money and its

11  source from law enforcement.

12        d.  Drug traffickers frequently make use of cellular telephones to arrange their

13  drug transactions.  These telephones are frequently pre-paid cellular telephones.  Drug

14  traffickers frequently provide little or no identifying information to the phone company,

15  and oftentimes the information provided is false.  Drug traffickers often discontinue the

16  use of these cellular telephones on a frequent basis in order to thwart law enforcement

17  efforts at detection.

18                                     **Use of Location Data**

19      43.  In my experience, the geographic location information requested in this

20  affidavit is useful in drug trafficking and money laundering investigations as the

21  information can be used to: (1) aid surveillance during suspected drug deals; (2) help

22  locate and identify target residences, DTO stash houses, and other storage locations; (3)

23  help identify where known and unknown conspirators live and the vehicles they drive; (4)

24  help identify sources of supply, customers, and other unknown conspirators who assist in

25  the distribution of narcotics and/or help launder the cash drug proceeds; (5) help

26  understand geographic breadth of the DTO how and where conspiracies operate; (6) help

27  identify locations of money transfer businesses used by members of the conspiracy to

28

AFFIDAVIT OF SA FUSCO - 14
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

launder cash drug proceeds or through which money is exchanged between co-
conspirators; and (7) help identify transportation sources used by the conspirators.

44. Based upon my training and experience, one way to identify co-
conspirators is to covertly follow suspect vehicles with electronic tracking devices known
to be utilized in furtherance of drug trafficking and money laundering offenses, and then
conduct an investigation using those names and addresses. Based upon the location
information, I would then direct other investigators to conduct surveillance at the
addresses and determine if criminal activity was occurring there, which in turn could lead
to potential names of conspirators and potential narcotics storage locations used by the
DTO. Obtaining this location information from target vehicles, as well as target phones,
is critical to accurately identifying such co-conspirators and locations, as the residences
of the targets are often times in either remote, rural areas, or small residential
neighborhoods, which make close, physical surveillance by agents almost impossible to
accomplish without being discovered by the suspects.

## AUTHORIZATION REQUEST

45. Based on the foregoing, I request that the Court issue the proposed search
warrants and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18
U.S.C. § 2703(c), and 18 U.S.C. § 3123.

46. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of
Criminal Procedure 4l(f)(3), that the Court authorize the officer executing the warrants to
delay notice to the subscriber or user of **TT1** until 120 days after the collection
authorized by the warrants has been completed. There is reasonable cause to believe that
providing immediate notification of the warrants may have an adverse result, as defined
in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TT1** would
seriously jeopardize the ongoing investigation, as such a disclosure would give that
person an opportunity to destroy evidence, change patterns of behavior, notify
confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(l). As further
specified in Attachment B1, which is incorporated into the warrant, the proposed search

AFFIDAVIT OF SA FUSCO - 15
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C.

2  § 3103a(b)(2). Moreover, to the extent that the warrants authorizes the seizure of any

3  wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or

4  electronic information, there is reasonable necessity for the seizure for the reasons set

5  forth above. *See* 18 U.S.C. § 3103a(b)(2).

6      47.    I further request that the Court direct T-Mobile to disclose to the

7  government any information described in Attachment B that is within the possession,

8  custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish

9  the government all information, facilities, and technical assistance necessary to

10  accomplish the collection of the information described in Attachment B unobtrusively

11  and with a minimum of interference with T-Mobile's services, including by initiating a

12  signal to determine the location of **TT1** on T-Mobile's network or with such other

13  reference points as may be reasonably available, and at such intervals and times directed

14  by the government. The agency shall reasonably compensate T-Mobile for reasonable

15  expenses incurred in furnishing such facilities or assistance.

16      48.    Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant

17  by serving the warrant on T-Mobile. Because the warrant will be served on T-Mobile,

18  who will then compile the requested records and data, reasonable cause exists to permit

19  the execution of the requested warrants at any time in the day or night. I therefore request

20  that the Court authorize execution of the warrants at any time of day or night, owing to

21  the potential need to locate **TT1** outside of daytime hours.

22      **REQUEST FOR SEALING AND DELAYED NOTICE**

23      49.    This narcotics trafficking investigation is ongoing.  To avoid seriously

24  jeopardizing this ongoing investigation into ESPIDIO and his criminal associates, known

25  and unknown, and to avoid the risk of the suspects' potential flight from prosecution and

26  destruction of evidence prior to indictment, I request that the Court order the application,

27  this affidavit, the tracking warrant, and the return, be sealed until further order of the

28  Court.  These documents discuss an ongoing criminal investigation that is neither public

AFFIDAVIT OF SA FUSCO - 16
USAO #2021R00661

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    nor known to the target of the investigation.  Based upon my knowledge, training, and

2    experience, it is my belief that making these documents publicly available and providing

3    immediate notification of the execution of these warrants will have an adverse result on

4    this investigation, as defined at Title 18, U.S.C., Section 2705(a)(2), and would likely

5    result in the targets' flight from prosecution, the destruction of or tampering with

6    evidence, the intimidation or retaliation against the CS and other potential witnesses, and

7    otherwise seriously jeopardize the ongoing investigation.  Accordingly, there is good

8    cause to seal these documents because their premature disclosure may seriously

9    jeopardize that investigation.  For the same reasons, and because investigators believe

10   this investigation is likely to take at least 90 days to conclude, I request a delay of 90

11   days to provide requisite notice of this warrant for a period of 90 days and, if needed,

12   may seek an extension of this request at that time.

13

14

15

16                                              SCOTT FUSCO, Affiant

17                                              Special Agent

18                                              Homeland Security Investigations

19

20        The above-named agent provided a sworn statement attesting to the truth of the

     contents of the foregoing affidavit on the 26th of May, 2021.

21

22

23

24                                              HON. BRIAN A. TSUCHIDA

25                                              United States Magistrate Judge

26

27

28

AFFIDAVIT OF SA FUSCO - 17
USAO #2021R00661